THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* MICHAEL DENNIS PISARSKI, Defendant-Appellant.

(No. 52923; ■■■■■■■■

First District—June 9, 1972.

Adamowski, Newey & Riley, of Chicago, (Francis X. Riley, of counsel,) for appellant.

Edward V. Hanrahan, State's Attorney, of Chicago, (Robert A. Novelle and James E. Sternik, Assistant State's Attorneys, of counsel,) for the People.

Mr. JUSTICE ENGLISH delivered the opinion of the court:

OFFENSES CHARGED

Murder. (Ill. Rev. Stat. 1965, ch. 38, pars. 9—1 (a-1) and (a-2).) Three counts of aggravated battery. (Ill. Rev. Stat. 1965, ch. 38, par. 12—4, par. 12—4 (b-1), and par. 12—4 (b-3).) Attempt (to commit murder). Ill. Rev. Stat. 1965, ch. 38, par. 8—4.

JUDGMENT

After a jury trial, defendant was found guilty of murder and one count of aggravated battery. He was sentenced to concurrent terms of 35 to 60 years for murder, and 4 to 5 years for aggravated battery.

CONTENTIONS RAISED ON APPEAL

1. Defendant was denied a fair trial because two jurors had read newspaper articles concerning defendant and the trial which had appeared in two Chicago daily papers on the evening the trial began and on the morning after the first witnesses were called.

2. Defendant was denied a fair trial because a State's witness, while demonstrating her version of defendant's handling of the gun at the time of the shooting, broke down sobbing in the presence of the jury.

3. Defendant's sentence was excessive.

EVIDENCE

In the summer of 1966, defendant and the decedent were very close to one another and considered themselves engaged. In December, 1966, defendant gave decedent a diamond ring which she wore on the third finger of her left hand. On April 8, 1967, when defendant went to visit decedent in her home, he was met by decedent's brother, who handed him the diamond ring and other items he had given decedent. The decedent was not present, but her mother told defendant that he could not see or speak to the decedent at all.

According to defendant's testimony, decedent called him on April 16, 1967, to tell him that it was not her idea, but her mother's and brother's, that they were not to see each other again. She told him that she still loved him, they arranged to meet on April 24, 1967.

On April 24, 1967, defendant went to the high school to pick up decedent, and they went for a ride.

Decedent's mother testified that on April 27, 1967, when defendant again came to her home, she told him that he was not to see her daughter again as she did not want to see or talk with him. Decedent was present in the room, but said nothing.

On May 3, 1967, at around 8:00 A.M., defendant went to speak with decedent at the high school which she attended. A teacher, Mr. Gerenstein, asked defendant to leave the building as he was no longer a student, but allowed defendant to leave by a particular exit so that he could say one thing more to decedent.

A girl student who was standing across the corridor from decedent's locker testified that defendant walked up to the decedent and said, "If you're smart, you'll do it," to which decedent replied, "No." Defendant then said, "See this." At this point, the witness had her back to defendant and decedent, but was looking over her shoulder at them and heard decedent say, "Michael." She saw defendant holding a gun straight ahead of him, and when the gun was closer to decedent's head or shoulders, defendant pushed the decedent so that she was leaning against the locker. The witness saw defendant raise the gun, and as the witness turned completely around to face the pair, she heard a shot. She saw decedent fall, and saw that defendant was "smiling and going hmm, like a pleased look."

After the first shot, defendant went down the hall toward the exit, still with the gun in his hand. He turned and fired three more times, wounding the instructor who had first asked him to leave the building.

Defendant testified that he went to the school to speak with decedent on May 3, 1967, at which time the decedent told him that she planned to tell her parents that she was going to marry him. He replied, "You are only going to get yourself in more trouble.  *  *  *" but decedent said that her mind was made up. Defendant then raised the pistol to his head to commit suicide, but decedent grabbed his hand and the gun went off. He did not remember pointing the gun at anyone after the shooting or firing more shots.

Although there was testimony as to the depressed state of defendant, a possible prior suicide attempt, and suicide and love notes, there was also testimony of a co-worker of defendant that defendant had said on April 29, 1967, "Well, I have been taking a lot of shit from [decedent] lately, and I'll shoot her." In any event, defendant was found guilty by a jury of both murder and aggravated battery, and since he does not contend that the evidence was insufficient to convict him beyond a reasonable doubt, we have set forth the above and following facts only as they relate to the three contentions raised on appeal.

OPINION

Defendant first contends that the trial court erred in not granting a mistrial after it was learned that two jurors had each read one of two newspaper articles concerning defendant and the trial which appeared

in Chicago daily papers on the evening the trial began and on the morning after the first witnesses testified.

The first article appeared in a question-and-answer column in answer to the question, "* * * the shooting last May at West Leyden Twp. High School in which a girl student was killed. What ever happened to the teacher shot in the hip?" The article reported that the teacher, who still has the bullet in his hip, is doing quite well, and that, as the athletic director of both East and West Leyden High Schools, he is on the job every day. The article went on to say: "By the way, the trial of the *accused* killer, Michael Pisarski, 18, a high school dropout, just began before Circuit Court Judge Francis T. Delaney. Eight jurors have been selected." (Emphasis added.) In addition, a brief summary of the incident followed which gave the information that decedent had ended a two-year romance with defendant, that defendant went to the high school to speak with the decedent, and that defendant *"allegedly* pulled a .22 calibre pistol and shot her in the head, then fired at [a teacher], hitting him in the hip." (Emphasis added.)

The second article was a news story which began with the headline, "DEATH THREAT TOLD IN GIRL'S SLAYING TRIAL," and the subheadline, " 'Will Shoot her,' Youth *Testifies."* (Emphasis added.) In addition to giving the date, time and place of the shooting, and various other personal information about the defendant, decedent, and wounded teacher, the article related some of the testimony of two state's witnesses and an admission reportedly made by the defendant when he was being questioned by the police subsequent to his arrest. The testimony of the witnesses, however, was not stated in the article as fact, but was always limited by the words, "testified that," and defendant's admission read that "Pisarski *reportedly* admitted the shooting and said he did it because, 'I was depressed and I loved her.' " (Emphasis added.)

■■■ Defendant argues that the jurors who had read the articles were tainted as of the moment of their exposure to the articles. Such is not the rule. In *People v. Berry,* 37 Ill.2d 329, 331, 226 N.E.2d 591, 592-593, the court, in affirming the denial of a motion for change of venue for adverse pre-trial publicity, stated:

"[T]he rule is that an accused is entitled to a change of venue when it appears there are reasonable grounds to believe that the *prejudice alleged actually exists* and that by reason of the prejudice there is a reasonable apprehension that the accused cannot receive a fair and impartial trial." (Emphasis added.)

The situation in the instant case, where the motion for a mistrial was based on the alleged prejudicial effect of publicity upon jurors already

selected, is essentially the same as in a case where a motion for change of venue is based on adverse pre-trial publicity. In neither instance will prejudice be assumed merely because of the exposure of potential or selected jurors to the publicity; it must be shown that it actually exists.

In the instant case, both articles were factual in character, but when matters in issue were described, the report carefully used such terms as "testified that" and "reportedly." Such objectivity may reasonably be expected to preclude any prejudicial effect on the jurors so long as the reports were accurate, as these were. However, to protect defendant's rights, the court examined each of the two jurors (and an alternate juror) who had read the news stories to discover if they were prejudiced against defendant as a result of their exposure to the publicity. Each of the jurors answered that the articles would in no way affect his judgment in the case or change the answers he had given during the *voir dire*. They declared that they would be fair and impartial and that they would keep an open mind until the case was closed. Both maintained that they still understood the prior warning given them by the court that defendant was entitled to a presumption of innocence, and that the State had the burden of proving guilt beyond a reasonable doubt.

The court in *Irvin v. Doud*, 366 U.S. 717, 722-723, 81 S.Ct. 1639, 1642-1643, stated that with today's widespread methods of communication, an important criminal case can be expected to arouse the public's interest so that most of those best qualified to be jurors will have some opinion as to the merits of the case. But the court continued and said:

"To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court."

The answers given by each of the jurors during his examination by the court gave the court an adequate basis for finding that he could "lay aside his impression or opinion and render a verdict based on the evidence." The court further guarded defendant's rights by repeatedly admonishing the jury to avoid reading newspapers, listening to the radio, watching television, or discussing the case with anyone. *People v. Yonder*, 44 Ill.2d 376, 387, 256 N.E.2d 321, 327, *cert.* denied in *People v. Guido*, 397 U.S. 975.

■■ We are satisfied, from a review of the record, that defendant received a trial before a fair and impartial jury and that the trial court

did not err in denying defendant's motion for mistrial. Even if such were not the case, defendant would be estopped from so asserting, since defense counsel declined to question the jurors as to any fixed opinions they might have gained after reading the articles. During the questioning of the first juror who had read the article, when the court asked whether either the State's Attorney or defense counsel would like to ask some questions, defense counsel replied, "This is Your Honor's province, if the Court please." Since the jurors' answers to the questions of the court revealed that the jurors were competent, it was up to defendant, if he still believed that the jurors were not impartial, to pursue the questioning further when given the opportunity to do so. *People v. Ward*, 32 Ill.2d 253, 259, 204 N.E.2d 741, 744-745; see also *Beck v. Washington*, 369 U.S. 541, 558, 82 S.Ct. 955, 964.

Defendant next contends that the trial court erred in not granting a mistrial after a State's witness, while demonstrating her version of defendant's handling of the gun at the time of the shooting, did so with what defense counsel (though not the record) later classified as an "outburst" in the presence of the jury, citing *People v. Duzan*, 272 Ill. 478, 493, 112 N.E. 315, 321. Additionally, defendant cites as error the fact that the court held a hearing and denied the motion in chambers and then proceeded with the case without admonishing or advising the jury as to the outcome of the episode.

This witness was a schoolmate of the decedent who had witnessed the incident, including the critical moment when defendant said he had been holding the gun to his own head. She testified to hearing a conversation between defendant and decedent at decedent's locker, and to seeing defendant with a gun in his hand. After she identified the gun, the State's Attorney asked her to relate to the court where defendant's hand was when he pushed decedent. She answered, "A gun was in the right hand and his left hand, I don't know, it was in this vicinity, somewhere in through here [indicating]." The State's Attorney asked if she would be able to demonstrate defendant's actions to the jury, and when the witness answered affirmatively, the court asked her to do so. She stepped down, and the court said, "Get the gun, young lady, and show us the way it was, if you can."

Defense counsel objected, and he and the State's Attorney began to argue. The court asked them both to step into chambers, at which time defense counsel made a motion for mistrial on the grounds that putting a gun in the hands of a young girl is improper, and that the ensuing scene was prejudicial to the defendant.

■■■ In general, the trial judge has a wide degree of discretion in

ruling upon the admissibility of courtroom demonstrations. (*People v. Carter*, 109 Ill.App.2d 15, 23, 248 N.E.2d 847, 851.) In the instant case, the court obviously felt that the greatest accuracy concerning the most critical part of the entire case would be gained through a demonstration by the witness, since it was the judge who asked the witness to take the gun in her hand and show, if she could, how defendant had held the gun prior to the shooting. Such a demonstration, which helped to clarify the matter in issue for the jury, was proper evidence, and it was not an abuse of discretion for the trial court to allow it.

■■ As to defendant's complaint of emotionalism, the law is clear that an emotional outburst is no reason for the granting of a mistrial if the outburst is giving vent to natural feelings and not simulated or attempted for the purpose of influencing the jury. (*Gourley v. Chicago & E. I. Ry. Co.*, 295 Ill.App. 160, 183, 14 N.E.2d 842, 851.) There is no hint from the in-chamber conversation that the emotional reaction of the witness was anything but the natural reaction of a 16-year-old girl who had to handle a gun to demonstrate how a schoolmate of hers was killed. We find that the court did not err in denying defendant's motion for a mistrial.

■■ Defendant lastly contends that the major sentence imposed was excessive because at the time of the sentencing, defendant was 19 years old, with no arrest record. The sentence is a serious one, but so also are the crimes committed—one face-to-face murder followed by wild shooting in a crowded school hall which, except for the most fortuitous of circumstances, might well have resulted in additional deaths. We are unable to find in this record sufficient grounds to justify the exercise of our authority to reduce defendant's sentence. Ill. Rev. Stat. 1971, ch. 110A, par. 615 (b) (4).

The judgment of the Circuit Court is affirmed.

Judgment affirmed.

LORENZ, P. J., and DRUCKER, J., concur.